# SPRATT v. EARLY et al., Appellants.

### Division Two, June 18, 1902.

1. **Appeals:** CORRECTED ABSTRACT: COSTS. Where the abstract of appellant falls short of the requirements of the rule, and the evidence has been well abstracted by respondent, the costs of the abstract and of the appeal will be adjudged against the appellant, although he may obtain a reversal of the judgment in this court.

2. **Homestead:** RIGHTS OF CREDITORS. If the judgment creditors can not reach the homestead property of their debtor for the payment of their debt, its sale or conveyance by him is no concern of theirs, since they have no right or claim therein, and where the head of a family (who in this case was a married woman, the property being an inheritance from her mother), sells the same and gives $1,500 thereof to her son to be by him invested in his own name in new residence property, it is not subject to the payment of her debts, and the conveyance to her son can not be set aside even though so made to defraud her creditors. In such case it is immaterial whether the deed was made to the son for the purpose of covering up her interest in the property, or whether he holds it in trust for her use and occupancy, or whether she meant to give him the $1,500, or to pay a debt she owed him—in either case, if the money was the proceeds of her homestead, the deed to the son could not be set aside as being in fraud of her creditors.

3. ————: TEMPORARY RENTING. The temporary renting by a married woman of her home in which she had, as the head of a family, acquired a homestead prior to her second marriage, and the renting by her husband of property elsewhere with the intention to return to her own home, did not have the effect of forfeiting her homestead.

Appeal from Buchanan Circuit Court.—*Hon. W. K. James, Judge.*

REVERSED AND DECREE HERE.

*M. G. & J. Moran* for appellants.

(1)    The only cause of action alleged in plaintiff's petition is that the deed under review was made without any consideration whatever and with fraudulent intent, etc.    No evidence whatever was introduced in support of this allegation; and a finding or judgment unsupported by evidence should be set aside.    Callahan v. Wame, 40 Mo. 132; Boland v. Railroad, 36 Mo. 491; R. S. 1899, secs. 798, 799.    It would appear from the findings of fact as made by the court, that it went outside of the pleadings, and engrafted new issues into the case.    In this regard it erred, as the judgment must be founded upon facts consistent with and embraced within the pleadings.    Newham v. Kenton, 79 Mo. 382; Muenks v. Bunch, 90 Mo. 500.    (2) The trial court erred in bottoming its findings of fact and judgment upon the theory that because defendant Early was living and making his home with his mother, at the times he loaned her the money, he could not recover because the law presumed such advancements to be gifts.    In this singular holding, the court reserves the rule, and places the child's property at the mercy of the "prowling creditors" of the parent.    Miller v. Simmons, 72 Mo. 669; Street v. Goss, 62 Mo. 226; Taylor v. Taylor, 8 How. (U. S.) 183.    (3) When the court found that Early advanced his mother money before and after attaining his majority, and while living with her, then it was in duty bound in law and equity to find that she obtained the money under an agreement to pay it back unless plaintiff showed to the contrary by clear, direct and positive testimony.    1 Story on Eq. Juris., secs. 307, 308, 309; Taylor v. Taylor, supra; Miller v. Simmons, supra.    (4) The court, in its findings of fact, found "that in 1872, defendant Elizabeth Duffy became, and until August 25, 1895, continued to be, the owner of a homestead exemption."    The testimony is clear, direct and positive in support of this finding.    It would appear, however, that the court, in another and later finding, found that in April, 1894, she left and abandoned her homestead.    If that be the true

Spratt v. Early.

meaning of the court's language, then there is no testimony to support the later finding. The testimony is clear, direct and positive that she had a homestead exemption in the property sold to Dawson up to and including August 25, 1895, the day she executed her deed to it. To produce abandonment of the homestead, the party must forsake and leave it with the present intent never to return to it again as a homestead. Smith v. Bunn, 75 Mo. 559; Leak v. King, 85 Mo. 413; Kaes v. Gross, 92 Mo. 655; Duffy v. Willis, 99 Mo. 135; Mills v. Mills, 141 Mo. 195; Potts v. Davenport, 79 Ill. 455; Leonard v. Ingraham, 58 Iowa 406; Riley v. Riley, 26 N. E. 604; McFarland v. Washington, 14 S. W. 354; Kati v. Joachinsthal, 56 N. W. 1101. (5) The court found that Mrs. Duffy owned her homestead on August 25, 1895, and on that day sold it to Dawson. She had the right to do with the proceeds of the sale as she pleased, and such acts on her part were not and could not be in fraud of right of plaintiff. Macke v. Byrd, 131 Mo. 682; Bank v. Guthrey, 127 Mo. 193; Hart v. Leete, 104 Mo. 337; Grimes v. Portman, 99 Mo. 227; Kendall v. Powers, 96 Mo. 142.

*John F. Tyler, John A. Connett* and *Jo. F. Woodson* for respondent.

(1) Fraud is rarely ever susceptible of positive proof. Its vermiculations are chiefly traceable by covered tracks and studious concealment. It is not presumed, but anything which satisfies the mind and conscience of its existence is sufficient. Massey v. Young, 73 Mo. 273; Leeper v. Bates, 85 Mo. 228; Snyder v. Free, 114 Mo. 376. (2) The grantor and grantee in the deed which respondent is seeking to set aside were, respectively, mother and son. The grantor and her husband were insolvent prior to and at the date of said transfer. There were many suspicious circumstances detailed in evidence in this case. "Fraud must be proved and can not be presumed.

. . . The relationship of the parties and the insolvency of the grantor are not sufficient, in themselves, to establish fraud, but these, when added to other suspicious circumstances, may often furnish satisfactory evidence of fraud." Robinson v. Dryden, 118 Mo. 539. (3) Under all the evidence, facts and circumstances shown in the trial of this case, the finding of the chancellor that the deed conveying the property in controversy from Mrs. Duffy to Early was fraudulent and void as to plaintiff, was proper. Imhoff v. McArthur, 146 Mo. 378; Milling Co. v. Burnes, 144 Mo. 192. (4) The fact that defendants Daniel and Elizabeth Duffy, with their entire family, removed to and lived on the farm mentioned in the evidence as the "Henshaw property," situated a few miles from the city of St. Joseph, which property they had leased for one year, and then lived in rented property after their removal from said farm to the city of St. Joseph, a total time of nearly a year and one-half, their former homestead being rented all of said time to different tenants, they never again, after removing to said farm, occupying said former homestead as a home, makes a prima facie case of abandonment of said homestead. St. Louis Brewing Co. v. Howard, 150 Mo. 451; Duffy v. Willis, 99 Mo. 136; Smith v. Bunn, 75 Mo. 559; Kaes v. Gross, 92 Mo. 655.

GANTT, J.—On October 18, 1899, the plaintiff instituted this suit in equity to set aside a deed from Daniel H. Duffy and wife to their co-defendant, Daniel H. Early, and to subject the lot of land described in said deed to the lien of a judgment obtained by plaintiff against said Daniel H. and Elizabeth Duffy his wife, in the circuit court of Buchanan county at the September term, 1898.

The plaintiff alleges that he obtained said judgment on a note executed by Daniel and Elizabeth Duffy on April 16, 1894, for $695.53, to one John Vahey, which, for value received, said Vahey assigned to plaintiff. He further alleges

that on September 8, 1898, the defendants Daniel and Elizabeth Duffy were the owners in fee simple of lot 9, block 28, in Patee's addition to the city of St. Joseph, and on said date with the intent to cheat, defraud, hinder and delay their creditors, and without any consideration whatever, executed and delivered to said Daniel H. Early, their co-defendant, a general warranty deed, by which they purported to convey to said Daniel H. Early said above described lot or parcel of land; that said Daniel Duffy and wife are insolvent and have no other property out of which said judgment can be enforced.

Daniel H. Early filed a separate answer which, omitting caption, is in these words:

"Comes now Daniel H. Early, one of the above-named defendants, and for his separate answer to plaintiff's first amended petition says, that he denies each and every allegation therein contained.

"For further answer defendant Daniel H. Early says that on August 29, 1895, he purchased from the plaintiff, the said William E. Spratt, the property described in plaintiff's amended petition, and paid him two thousand five hundred dollars therefor. That he thereafter continued to own said property until the third day of January, 1896, when he sold and transferred said property to Elizabeth Duffy in consideration of two thousand five hundred dollars, to be paid to him by the said Elizabeth Duffy in the future from that date, and that in the event of the said Elizabeth Duffy failing to pay him said sum of two thousand five hundred dollars, the purchase price of said property, then she was to reconvey said property back to him, the said Early. That pursuant to this agreement the said Elizabeth Duffy continued to own the naked legal title in and to said property until September 8, 1898, when, being unable to pay any part of the purchase price, she reconveyed the property back to said Daniel H. Early, under and pursuance to the agreement aforesaid. That

said Elizabeth Duffy never paid any part of the purchase-price, and that at the time she transferred said property back to said Daniel H. Early, she had no interest or title in or to said property other than the naked legal title, and that said property at no time was subject to any indebtedness of the said Elizabeth Duffy that was in existence on said January 3, 1896, the date said Daniel H. Early conveyed said property to her under the agreement aforesaid. Having fully answered, said defendant Daniel H. Early prays to be discharged with his costs in this behalf expended."

Daniel H. Duffy and Elizabeth Duffy filed their separate answer in said cause, which said answer is in words and figures as follows:

"Now at this day come the above-named Daniel H. Duffy and Elizabeth Duffy and for their separate answer say that they deny each and every allegation in plaintiff's amended petition contained. Having fully answered they pray to be dismissed from this action."

Plaintiff filed a reply to separate answer of Daniel H. Early denying generally the new matter alleged therein.

The cause was tried at the January term, 1899, and a decree rendered for plaintiff that said conveyance from Elizabeth Duffy and D. H. Duffy, of date September 8, 1898, to Daniel H. Early of lot 9 in block 28 in Patee's addition to the city of St. Joseph, was null, void, and of no effect; that said judgment was a lien thereon, and gave defendants thirty days in which to pay the same and in case of their failure to pay it in that time, the sheriff should sell the same as in case of sales under execution, to satisfy said judgment and costs. At the request of defendants the court made a special finding of facts and his conclusions of law thereon, to which defendant excepted at the proper time. It is deemed unnecessary to set out the findings in full. Plaintiff called each of the defendants as witnesses and their testimony constitutes the bulk of the evidence.

The evidence has been very well abstracted on the part of plaintiff; on part of defendants the abstract falls far short of the requirements of our rules, and for that reason the cost of it has been adjudged against defendants.

We glean the following facts from the record. On or about April 16, 1894, John Vahey, as surety for defendant Daniel Duffy, paid a note to the Saxton Bank in St. Joseph for $500; thereafter Daniel Duffy and Elizabeth Duffy, his wife, executed and delivered to said Vahey their promissory note for said $500 and interest; this note Vahey assigned to Wm. E. Spratt, the plaintiff, who brought suit on it in the circuit court of Buchanan county, and obtained service on said Duffys a few days prior to September 8, 1898, and obtained judgment against them thereon on October 11, 1898. Defendant Daniel H. Early is a son of his co-defendant Mrs. Elizabeth Duffy and a stepson of Daniel Duffy. He was known as "Harry J. Early" and as such did business and kept his bank account. He testifies he was baptized and confirmed in the Catholic church by the name of Harry J. Early and never knew until the deed from plaintiff Spratt was about to be made to him, that his name was Daniel H. Early, when his mother told him his true name was "Daniel H." instead of "Harry J.," and the deed was made accordingly at his suggestion. He was twenty-nine years of age when the trial took place in January and February, 1899. He lived in his mother's family as a member thereof, as well after her marriage to Mr. Duffy, as prior thereto, until June, 1897, when he married, and ceased to live with her, and made his home with his wife's mother. He testified that he began to work for wages when he was about fifteen years old, at a salary of $20 a month. In 1890 he was employed by the Grand Island Railroad Company at $50 a month. In 1891 it was increased to $60 a month. It was increased to $65 in four or five months and then to $75 and at the time of the trial it was $100 a month. He testified that up to the time he

was of age in March, 1891, he gave his mother $12.50 or even $40 a month out of his wages. He also testified that he had a verbal understanding with his mother that she was to pay him back in cash at her convenience, and failing to do so she was to convey to him the *homestead*, the property on Tenth street, or "the Dawson property," which property Mrs. Duffy owned from 1872 to 1895, by inheritance from her mother, Mrs. Carr, and which she had occupied as her homestead for twenty-two years. In 1894 she, with all the family, left said " Dawson or homestead property," and moved out into the country temporarily, but she and her husband and son testified that the town or Dawson property still remained her homestead; that she never abandoned it as such, and that they only went to the "Henshaw" or "country place" for a little recreation. They leased it for one year, but the house burned down before the end of the year, and they returned to St. Joseph in a few months, to some property which they rented.

They rented the homestead to O'Connor by the month. He kept it a few months and she then rented it to Dawson, until August 24, 1895, when she sold it to him for $2,900, of which $1,700 was cash and the balance, $1,200, was secured by deed of trust on the property. Of the $1,700 thus received she turned over to her son Early $1,000 as soon as she received it, and a few days later gave him $500 more, and he deposited both sums in the Tootle-Lemon Bank in his name as "Harry J." Early. Dawson paid the $1,200 in installments, the last in December, 1897. In 1895, after the sale of the homstead property, Daniel Duffy negotiated for the purchase of the property in controversy in this suit without disclosing D. H. Early as the purchaser until the day the deed was executed by Spratt to Early. Daniel Duffy handed Spratt a check for $1,000 signed by "Harry J." Early on the Lemon-Tootle Bank. On January 3, 1896, Daniel Early drew another check, signed "Harry J." Early for $506.60 and

paid the same on said purchase, and on the same day by warranty deed conveyed said lot to his mother Elizabeth Duffy. Mrs. Duffy in one portion of her testimony says her son made this conveyance to her "because he was going to get married and wanted to give her a home." Mr. and Mrs. Duffy lived in this property from the time of the execution of Spratt's deed to Early until the trial of this suit. The payment of $506.60 by Early was made and credited on a $1,500 note of Spratt to John F. Tyler which Early assumed when he bought from Spratt, leaving a $1,000 and interest still due on the lot. Early paid no more on the property after the execution of his deed to his mother. She never paid him anything for the property after that. Later, on August 23, 1898, she and her husband mortgaged the property to Hoagland for $1,200, out of which she paid the balance on said note to Tyler, and used the remainder for herself.

On September 8, 1898, Daniel Duffy's wife reconveyed the lot in suit to Daniel Early for the expressed consideration of $2,500, and on the same date Early and wife gave a deed of trust thereon to secure Mrs. Duffy the payment of $1,000 two years after date.

These two instruments were made after the suit of Spratt was commenced against the Duffys on the Vahey note, and after they were served with the writ of summons. The evidence tends to show that Mrs. Duffy's deed to defendant Early was made out and taken to him without a request therefor by him, or any negotiation therefor. Her deed of trust for $1,000 was afterwards released by Mrs. Duffy without receiving any part of the note.

I. A reversal is sought on two grounds; first, that the money which purchased the lot in suit from Spratt was furnished by defendant Daniel H. Early, and his subsequent conveyance to his mother and the reconveyance by her to him was not and could not have been a fraud on plaintiff, as plaintiff

was and is only entitled to look to assets of Daniel Duffy and wife for the satisfaction of his judgment against them.

The circuit court found that the purchase money was advanced by Mrs. Duffy out of the proceeds of the sale of her homestead, and that finding is fortified by the testimony, unless it be conceded that while the purchase money was clearly shown to have been the price she received from the sale of her homestead or Dawson lot, it became the money of Daniel Early before he paid it over to Spratt for the lot in suit.

It rarely occurs that a fund can be traced so satisfactorily as the purchase price of the homestead lot has been in this case.   Mrs. Duffy sold Dawson her homestead August 24, 1895, and received $1,700 cash down, and of this amount she turned over $1,500 to her son Daniel Early, and on August 29, 1895, the trade was made by her husband, Daniel Duffy, with Spratt, and the deed made to Daniel Early, and he gave a check for $1,000 that day on his account with the Lemon-Tootle Bank, which account had received a credit on August 26th of $1,246.30, and on January 3, 1896, he checked $506.60 in favor of Tyler who held Spratt's note for $1,500, which was a lien on the lot and had been assumed by Early when he bought the lot.   All the credible evidence tends to corroborate that Early received this $1,500 directly from his mother contemporaneously with his receiving the deed to the lot.

Early testified that while it was true he received the $1,500 from his mother, it was a repayment to him of moneys he had advanced his mother and stepfather Duffy out of his monthly wages as clerk of the Grand Island railroad.   He testified these advancements amounted at that time to about $3,500, and his mother had agreed to repay him for the moneys he had advanced for the support of his mother's family of which he was a member.   That Early bought or took the deed in his own name for the benefit of his mother and was

only investing her money in his name, is consistent with all the evidence. Thus the trade was made by his step-father Duffy; his mother just prior to the execution of the deed advanced him the $1,500; he had other moneys to the amount of $550 to his credit in the bank at the time, but he never paid any other part of the purchase money therefor except the $1,500, *then,* or afterwards, and on the date of his payment of the $506.60, he executed a deed to the lot in suit to his mother. He took the lot subject to a $1,500 lien in favor of Tyler and after the deed to her Mrs. Duffy borrowed $1,200 by deed of trust on the lot and paid off the remaining $1,000 due Spratt or Tyler. In the meantime, she spent $200 for her own benefit. She did not pay Early any other consideration for the lot. She gave him no note or memorandum showing she owed him the $2,500 mentioned as the purchase price or the $1,500 over and above the deed of trust for $1,000 still on it. Mrs. Duffy collected the remaining $1,200 due her from Dawson and there was no demand by Early for an assignment of that note to secure him the $2,000 which he asserts she still owed him and promised to pay out of the homestead. Thus matters remained until Spratt began his suit against the Duffys on the Vahey note, when without consultation or previous negotiation Mrs. Duffy and her husband reconveyed to Early, as he says, because she agreed if she could not pay him the $2,500, the price of said lot, she should retransfer the lot to him, but at this time another transaction took place which is entirely out of harmony with his testimony that the relation of creditor and debtor existed between Daniel Early and his mother, Mrs. Duffy, i. e., a deed of trust was given by Daniel Early and his wife to Mrs. Duffy to secure a $1,000 note executed by them that day. If Mrs. Duffy had not in fact paid the purchase money ($2,500) for said lot, and Early had, she still owed him $2,000 on his advancement to her, and while the reconveyance would wipe out the consideration money accord-

ing to their alleged agreement, it would not satisfy the $2,000 balance, and yet notwithstanding the account thus stood between them, Early and wife by note and deed of trust acknowledge they owe Mrs. Duffy $1,000. This transaction is, in our opinion, utterly incompatible with the testimony of Mrs. Duffy and her son. Their attempted explanation only confirms the finding of the court that, in truth and in fact, Mrs. Duffy did not owe Daniel Early $3,500 or any other sum at and prior to the sale of her Dawson property; that in fact it was her money which paid Spratt for the land in suit and it was conveyed to Early to protect it from the creditors of Mrs. Duffy, and its reconveyance resulted from the contemplated marriage of Early, which might and would vest rights in his intended wife. No other conclusion is consistent with the conduct of the parties.

We are thus brought to the second contention of the defendants, that, admitting it was Mrs. Duffy's money that paid for the lot in suit, and that she directed it to be conveyed to her son Daniel Early without any consideration moving from him to her, and that he subsequently conveyed it to her also without consideration, other than the $1,500 given him by her, and she afterwards conveyed it to him without consideration, inasmuch as the purchase money was the proceeds of her homestead it was not subject to levy or attachment by her creditors, and no fraud can be predicated upon any disposition she may have seen fit to make of it; that she could give it away if she chose without any wrong to Spratt or Tyler or any other creditor. This presents the most important question on this record.

The evidence tends to show, without contradiction, that Mrs. Duffy inherited the Dawson lot from her mother, Mrs. Carr, in the year 1872, and has lived on it and occupied it as her homestead continuously from 1872 until she rented it by the month to O'Connor in the summer of 1894.

Prior to the amendment of the Homestead Act, section

2695, chapter 39, Revised Statutes 1879, by the Act of March 24, 1887 (Laws 1887, p. 198), homesteads acquired by descent or devise were not exempt from attachment and levy under execution as were homesteads acquired by deed. [Loring v. Groomer, 142 Mo. 1.] But by the express provision of said last-mentioned act, homesteads held by descent or devise fell within the protection of the statute "from the time the owner becomes invested with the title thereto; and in case of existing estates such homestead shall not be subject to attachment or levy of execution upon any liability hereafter created."

In Loring v. Groomer, it was further said such existing homestead, occupied by a head of a family, not exceeding the amount and value prescribed by statute, became exempt after the Act of 1887, from attachment and execution on all causes of action accruing thereafter and it made no difference how it was acquired or whether the title thereto was in him or his wife. [142 Mo. loc. cit. 12; Peake v. Cameron, 102 Mo. 568, 574.]

Mrs. Duffy, after the Act of 1887 became the law of this State, owned a homestead in fee simple in the lot in suit and was such owner when she married her co-defendant, Daniel Duffy, her present husband, in 1879. By her marriage to Duffy, who continued to occupy said homestead with her, she did not forfeit her homestead exemption. [West v. McMullen, 112 Mo. 410; Hufschmidt v. Gross, 112 Mo. 649.]

Neither did the temporary renting of her homestead by the month, and the renting a piece of property in the country by her husband with the intention to return to her home in the city, have the effect of forfeiting her homestead therein. [Hufschmidt v. Gross, supra.]

She did not acquire any other homestead until she sold her homestead in the Dawson property, and the proofs as already stated show beyond a peradventure that the proceeds

Vol. 169 mo—24

of that homestead went into the property in suit, which also became her homestead and she, her husband, and family have continuously occupied it as a homestead since the deed was made to her son in 1895 by plaintiff Spratt, and up to the trial of this suit. This property being her homestead when she executed the deed in September, 1898, to her son Daniel H. Early, the question arises, was that conveyance a fraud on plaintiff who was a creditor of herself and her husband?

In Vogler v. Montgomery, 54 Mo. 577, it was ruled that neither a fraudulent conveyance nor an act of bankruptcy would produce a forfeiture of the benefits of the homestead exemption. [Citing Cox v. Wilder, 2 Dillon C. C. 46.] That ruling was reaffirmed in State ex rel. v. Diveling, 66 Mo. 375. In Burns v. Bangert, 92 Mo. l. c. 177, that case was again approved, and it was said of exempt property, "If his creditors can not reach it for his debt, its sale or conveyance is no concern of the creditors, since they have no right or claim thereon. They can only complain of sales and conveyances of property that is subject to their debts. To this extent the creditors have no standing in court." [Davis v. Land, 88 Mo. 436; Hartzler v. Tootle, 85 Mo. 31.] All these cases were reviewed in Bank v. Guthrey, 127 Mo. loc. cit. 193, and the doctrine reasserted and finally settled in Macke v. Byrd, 131 Mo. 691.

So that if we take the view for which plaintiff contends, that Mrs. Duffy sold her homestead in the Dawson property and out of its proceeds invested $1,500 in the land in suit for her own benefit, but in the name of her son, and afterwards took the deed to herself, she thereby acquired a homestead therein, and in so doing she perpetrated no fraud on her creditors because the statute expressly permitted her to acquire a new homestead, and it was exempt from the lien of any execution or attachment, and they were not concerned therein, as she was at liberty to mortgage, alien, sell or dispose of it in any manner she might deem proper, and conse-

quently her deed to her son in September, 1898, is not subject to be set aside in equity any more than to be sold under execution or attachment. [Bank v. Guthrey, 127 Mo. 195.]

If the Dawson property had not been the homestead of Mrs. Duffy, and if the evidence did not conclusively establish that the proceeds thereof had been invested in a new homestead, the property in suit, we think the finding of the court, that the deed from Mrs. Duffy and her husband was made to prevent the collection of plaintiff's judgment, must have been sustained; but as both of said homesteads were exempt from execution or attachment and equally exempt from a proceeding in equity to set aside a conveyance thereof even if fraudulent, the judgment of the circuit court must be and is set aside, and the bill dismissed, which is accordingly directed in this court, at the cost, however, of defendants, as a penalty for their failure to make a proper abstract and statement of the case in accordance with the rules of this court.

Judgment reversed, and decree in this court. All concur.